# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MICHAEL SNOWDEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15-cv-1382 (KBJ) |
| | ) | |
| RYAN ZINKE, *Secretary, U.S. Department of the Interior*, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

Plaintiff Michael Snowden is an African American male who formerly worked as a Sergeant for the United States Park Police ("USPP"). (*See* Compl., ECF No. 1, ¶¶ 3, 16–17.) On August 25, 2015, Snowden filed the instant complaint under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, alleging that USPP discriminated against him on the basis of race when it demoted him and later terminated his employment. (*See* Compl. ¶¶ 53–60.) Snowden further alleges that USPP retaliated against him for filing an Equal Employment Opportunity ("EEO") complaint that challenged his demotion. (*See id.* ¶¶ 62–68.)

Before this Court at present is USPP's Motion to Dismiss or, Alternatively, for Summary Judgment.[1] (*See* Def.'s Mot. to Dismiss or, Alternatively, for Summ. J. ("Def.'s Mot."), ECF No. 47-2.) USPP argues that Snowden cannot proceed with his claims regarding his demotion, as he failed to exhaust available administrative

---

[1] Although the named defendant in this case is the Secretary of the Interior, this Memorandum Opinion will refer to the defendant as "USPP" throughout.

remedies.  (*See id.* at 3.)[2]  USPP also maintains that Snowden's demotion and termination were "effectuated pursuant to the terms of a valid, voluntarily executed contract"—specifically, a Last Chance Agreement—pursuant to which Snowden had waived his rights to challenge any adverse employment action stemming from the agreement.  (*See id.* at 3, 12–13.)  Given the existence of this contract, USPP argues that Snowden cannot show that his demotion and termination were the result of discrimination or retaliation, nor can he prove that USPP's asserted non-discriminatory reasons for demoting and terminating him are pretextual.  (*See id.* at 3–4.)  In response, Snowden contends that he exhausted his administrative remedies, that the parties' contract does not bar his claims, and that the evidence, when construed in his favor, demonstrates that USPP's explanations for his demotion and termination are pretextual. (*See* Pl.'s Opp'n to Def.'s Mot. to Dismiss or, Alternatively, for Summ. J. ("Pl.'s Opp'n"), ECF No. 48, at 24, 28, 31, 38.)

On November 30, 2020, this Court issued an Order that **GRANTED** USPP's motion.  (*See* Order, ECF No. 51.)  This Memorandum Opinion explains the reasons for that Order.  In short, and as explained fully below, this Court has concluded that Snowden waived his right to bring a legal action challenging his demotion and termination, pursuant to the terms of the parties' valid contract.  The Court has further determined that, even if Snowden had not waived his rights in this regard—and even if the Court assumes that Snowden has exhausted all administrative remedies—no reasonable jury could find that USPP's stated reasons for Snowden's demotion and

---

[2] Page-number citations to the documents that the parties and the Court have filed refer to the page numbers that the Court's Electronic Case Filing System ("ECF") automatically assigns.

2

termination are pretextual.  Therefore, USPP is entitled to summary judgment with respect to all of Snowden's claims.

## I.   BACKGROUND

### A. Factual Background[3]

Snowden began his employment with USPP as an Officer in 1987.  (*See* Compl. ¶ 16.)  Over time, he rose up through the ranks and was promoted to Sergeant.  (*See id.* ¶ 17.)  In that role, Snowden supervised other law enforcement officers in USPP's Communications Section and had "authority to enter, watch over, retrieve and guard vital information from the Washington Area Law Enforcement System . . . and National Criminal Information Center[.]"  (*See* Ex. E to Def.'s Mot. ("Decision on Proposed Removal"), ECF No. 47-7, at 3; *see also* Pl.'s Resp. to SUMF ¶ 15.)

#### 1.   Snowden's First Offense

In August 2004, while working a shift at the Communications Section, Snowden received a call from his relative, Brian Lamont.  (*See* Pl.'s Resp. to SUMF ¶ 8; Decl. of Michael Snowden ("Snowden Decl."), ECF No. 48-3, ¶ 7.)  On the call, Lamont asked Snowden for the registration information associated with a specific license plate— information that Snowden had the ability to obtain through law enforcement databases. (*See* Snowden Decl. ¶ 7.)  At the time of this call, USPP's General Order 50.05 provided that the "misuse of a law enforcement information network m[ay] result in the Force losing access to the system and individual disciplinary/adverse action being

---

[3] Unless otherwise noted, the facts recounted in this Memorandum Opinion—which are drawn from the complaint, the record evidence, and Plaintiff's response to Defendant's Statement of Undisputed Material Facts—are undisputed.  (*See generally* Compl.; Exs. A–CC to Def.'s Mot., ECF Nos. 47-3–31; Exs. 1–13 to Pl.'s Opp'n, ECF Nos. 48-3–15; Exs. CC–GG to Def.'s Reply in Supp. of Mot. to Dismiss or, in the Alternative, for Summ. J. ("Def.'s Reply"), ECF Nos. 49-1–5; Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ("Pl.'s Resp. to SUMF"), ECF No. 48-1.)

initiated." (*See* Pl.'s Resp. to SUMF ¶ 9.)  The General Order also prohibited USPP employees from "releas[ing] law enforcement information from a computerized network to anyone other than a Force officer or an individual designated by the Commander, Technical Services Branch/Field Office Commander." (*See id.* ¶ 10.)

Notwithstanding this General Order, Snowden procured the requested data and gave it to Lamont, even after acknowledging that he could lose his job for providing that information.  (*See id.* ¶ 8.)  But unbeknownst to Snowden, Lamont was not the only person on the phone; the Drug Enforcement Agency ("DEA") had intercepted the phone call, as Lamont was a known felon under DEA investigation.  (*See id.* ¶¶ 4, 8.)  And when USPP learned of Snowden's transgression in January of 2005, it initiated an investigation into Snowden's conduct.  (*See id.* ¶ 5.)  While this investigation was ongoing, USPP suspended Snowden's police powers and placed him on leave with pay. (*See* Compl. ¶¶ 21–22; Snowden Decl. ¶¶ 11–12.)

USPP's investigation into the incident came to a close on March 8, 2006; on that date, it sent Snowden a Notice of Proposed Removal, which charged him with Misuse of a Law Enforcement Computer System, Lack of Candor during interviews with officials from the DEA, Association with a Known Felon, and Neglect of Duty.  (*See* Compl. ¶ 23; Ex. C to Def.'s Mot., ECF No. 47-5, at 2–4.)  Snowden provided an oral response to this notice, conceding that he had used the law enforcement databases to share information with Lamont, but also insisting that he did not know Lamont was a felon. (*See* Snowden Decl. ¶¶ 14–15.)  Snowden further maintained that many other officers, including his superiors, regularly used the law enforcement databases to access information for third parties.  (*See id.* ¶ 15.)

4

USPP reached a decision on Snowden's proposed removal on August 6, 2008.  It sustained two of the four charges—Misuse of a Law Enforcement Computer System and Neglect of Duty—and informed Snowden that his conduct warranted his removal.  (*See id.* ¶ 19; Decision on Proposed Removal at 2.)  USPP explained that, as a supervisor who is "held to a higher standard of responsibility[,]" Snowden's decision to "ignore[] the rules and regulations governing" law enforcement databases and "create[] a potentially dangerous situation for" the person whose contact information he "freely g[a]ve away" was "egregious[.]"  (*See* Decision on Proposed Removal at 3.)  USPP nevertheless opted to give Snowden one final opportunity to remain employed with the park police force, and presented him with a Last Chance Agreement ("LCA") as an alternative to removal.  (*See id.* at 4.)

### 2.  The Last Chance Agreement

The LCA—which, by its terms, would remain in effect for three years after the date of the last signature on the agreement—provided that USPP would hold Snowden's "removal action . . . in abeyance" if he agreed to and complied with the conditions laid out in the contract.  (*See* Ex. F to Def.'s Mot. ("LCA"), ECF No. 47-8, at 2.)  In relevant part, the LCA stated that, by signing the agreement, Snowden:

> [A]cknowledges that the charges represent unacceptable behavior for which [USPP] could have legitimately removed him from his position . . . had he not elected to participate in the alternate discipline that this agreement represents[;]
>
> . . . understands that as a part of this LCA, he will be demoted from the position of Sergeant to a position of Police Officer (Private), effective August 31, 2008[;]
>
> . . . [and] agrees not to engage in any sustained misconduct of any kind during the duration of this Agreement . . . [and] further agrees that if he engages in any sustained misconduct during this time frame, he will have

breached the terms of the Agreement and [USPP] will reinstate the removal action without further notice.

(*Id.* ¶¶ 1–3.)  For its part, USPP promised that "if [Snowden] complies with all of the terms of the LCA and therefore does not breach this Agreement, [USPP] will rescind the removal decision and the LCA."  (*Id.* ¶ 9.)  Importantly, the LCA further provided that "if [Snowden] breaches this Agreement and the removal action is effected, he waives any and all rights to challenge, grieve, litigate, complain or appeal any disciplinary action."  (*Id.* ¶ 15.)

After receiving a copy of the LCA, Snowden conferred with his attorney, and then asked the Acting Assistant Chief of Police to make a few changes to the contract, including altering specific language and inserting a provision that rescinded Snowden's demotion once the LCA expired.  (*See* Pl.'s Resp. to SUMF ¶¶ 17, 19–20.)  The Acting Assistant Chief granted Snowden's first request, but refused the request to modify the terms of Snowden's demotion.  (*See id.* ¶ 20; Ex. O to Def.'s Mot., ECF No. 47-17, at 14.)  Snowden eventually signed the agreement, more than sixty days after USPP presented it to him, and the Acting Assistant Chief countersigned a few weeks later. (LCA at 5; *see also* Pl.'s Resp. to SUMF ¶ 21.)

Following the execution of the LCA, Snowden proceeded to work at USPP without incident for almost two years.  However, during that time, he was not actually demoted in terms of his salary (*i.e.*, he continued to be paid at the Sergeant level), and he continued to receive the same benefits that he had received prior to the LCA, notwithstanding the fact that he was supposed to have been demoted immediately after the LCA took effect.  (*See* Pl.'s Resp. to SUMF ¶ 34.)  USPP realized its mistake in this regard in June of 2010, after discovering that a clerical error had prevented Snowden's

demotion from being reflected in its payment system. (*See id.* ¶¶ 33, 35; Ex. S to Def.'s

Mot., ECF No. 47-21, at 9.) USPP additionally attributed the delay in implementing the

terms of the LCA to its attempts to place Snowden in a non-law-enforcement position

after he suffered an on-the-job injury that compromised his ability to serve on active

duty. (*See* Pl.'s Resp. to SUMF ¶ 33; *see also* Ex. S to Def.'s Mot. at 11–13.)[4]  In any

event, USPP notified Snowden on June 10, 2010, that, pursuant to the LCA, he was

being demoted, and that his demotion would occur on July 18, 2010. (*See* Pl.'s Resp. to

SUMF ¶ 35; Ex. J to Def.'s Mot., ECF No. 47-12, at 4.)

### 3. Snowden's Second Offense

On July 4, 2010—after Snowden received notice of his upcoming demotion, but

before the demotion took place—USPP assigned Snowden to monitor suspicious

activity on the National Mall from the vantage point of a nearby sky tower.  At that

point in time, the sky tower contained a closed-circuit television ("CCTV") camera,

which relayed real-time footage to USPP officers and FBI agents in a Mobile Command

bus. (*See* Pl.'s Resp. to SUMF ¶¶ 36–38, 40–42.)

At some point during Snowden's shift, an FBI agent in the Mobile Command bus

noticed that the CCTV camera to which Snowden had been assigned was transmitting

close-up footage of various women's chests and buttocks. (*See id.* ¶¶ 38, 42; Ex. H to

Def.'s Mot., ECF No. 47-10, at 2.)  The FBI agent informed USPP that "the FBI was

viewing these images, that the camera was not being used appropriately, and that the

operator of the camera needed to be made aware that others were seeing these images."

(Pl.'s Resp. to SUMF ¶ 42.)  A USPP employee, Sergeant Fred Grefe, subsequently

---

[4] Snowden disputes this justification, claiming that the delay resulted solely from USPP's "failure to follow through with the demotion and from clerical error."  (*See* Pl.'s Resp. to SUMF ¶ 33.)

relayed this message to Snowden, and according to Sergeant Grefe, Snowden replied with "words to the effect of 'oh man, busted.'"  (Ex. H to Def.'s Mot. at 5.)  Snowden denies making this statement (*see* Pl.'s Resp. to SUMF ¶ 44), and he alleges that Sergeant Grefe treated the incident as a joke—as did Captain Charles Guddemi, a USPP official who saw the images from the Mobile Command Bus (*see* Snowden Decl. ¶¶ 29, 31).

Regardless, Captain Guddemi initiated an administrative complaint against Snowden the following month, charging him with "Inappropriate use of CCTV Camera."  (Ex. G to Def.'s Mot., ECF No. 47-9, at 2–3.)  The Internal Affairs Unit then conducted an investigation into Snowden's use of the CCTV camera, and one of the investigators, Detective Sergeant Stephen Godfrey, added an additional allegation against Snowden for "Inattention to Official Duties" in light of the "information [Godfrey] gathered during the course of the investigation."  (Ex. Y to Def.'s Mot., ECF No. 47-27, at 3; Ex. G to Def.'s Mot. at 4.)  The Internal Affairs Unit also interviewed Snowden about the incident (*see* Ex. H to Def.'s Mot. at 2–3), and during the interview, Snowden defended his behavior, claiming that he had simply been "doing [his] job" by monitoring the crowd (*see* Ex. EE to Def.'s Reply, ECF No. 49-3, at 6).  Yet, at the conclusion of the investigation, the Internal Affairs Unit recommended sustaining both charges against Snowden (*see* Ex. I to Def.'s Mot., ECF No. 47-11, at 2), and USPP's Office of Professional Responsibility ultimately did so on August 25, 2011 (*see* Ex. L to Def.'s Mot., ECF No. 47-14, at 2).

Five days after the charges were sustained, USPP's Chief of Police issued an amended removal decision concerning Snowden's employment with USPP.  The

decision quoted the LCA and explained that Snowden had breached the agreement on July 4, 2010, by inappropriately using the CCTV camera and neglecting his official duties. (*See* Ex. M to Def.'s Mot., ECF No. 47-15, at 2–3.)  The decision also informed Snowden that he would be terminated, effective immediately, and reminded him that, per the LCA, he had waived "any and all rights" to appeal his removal. (*See id.* at 3.)

### B. Procedural History

On August 17, 2010, Snowden appealed his demotion and the imposition of the LCA to the Merit Systems Protection Board ("MSPB"), arguing that "the LCA was invalid and, thus, his demotion under the terms of the LCA was improper." (*See* Pl.'s Resp. to SUMF ¶ 54.)  An administrative law judge held a hearing on the matter and ultimately dismissed Snowden's appeal for lack of jurisdiction, finding that the LCA was a valid contract that explicitly provided for Snowden's demotion. (*See id.* ¶¶ 55–58; Ex. O to Def.'s Mot. at 21–29.)  Snowden then appealed the administrative law judge's ruling, which the MSPB upheld. (*See* Pl.'s Resp. to SUMF ¶ 60.)  Snowden returned to the MSPB on September 28, 2011, to appeal his termination.  An administrative law judge again dismissed his appeal for lack of jurisdiction based on the LCA, finding that Snowden had waived his right to appeal his removal. (*See id.* ¶¶ 61–62.)

In addition to pursuing administrative remedies through the MSPB, Snowden also challenged his demotion and termination through the EEO system.[5]  In his formal

---

[5] The parties dispute *when* Snowden initiated EEO proceedings.  According to Snowden, he first contacted an EEO counselor about his demotion and the LCA in the fall of 2008, and the counselor told him that he had to wait until any adverse employment action occurred before he could file a complaint. (*See* Pl.'s Resp. to SUMF ¶ 63; Snowden Decl. ¶ 20.)  Snowden maintains that he returned to the EEO counselor on August 16, 2010, after his demotion went into effect, but he ended up having to put his informal EEO complaint on hold while he pursued the MSPB appeal; he then allegedly renewed the EEO proceedings on December 1, 2010, after the MSPB dismissed his appeal. (*See* Snowden Decl. ¶¶

EEO complaint, Snowden alleged that USPP discriminated against him on the basis of race when it forced him to sign the LCA and eventually demoted him.  (*See* Ex. J to Def.'s Mot. at 4–5.)  Snowden later amended the EEO complaint after his termination, asserting that USPP had removed him from the police force in retaliation for initiating EEO proceedings.  (*See* Ex. V to Def.'s Mot., ECF No. 47-24, at 3.)  The Department of the Interior issued a final decision on Snowden's EEO complaint on May 26, 2015, finding that the evidence did not support either of Snowden's claims.  (*See* Ex. Q to Def.'s Mot., ECF No. 47-19, at 26, 28.)

Snowden filed the instant lawsuit on August 25, 2015, following the dismissal of his EEO complaint, asserting claims under Title VII for race and color discrimination and unlawful retaliation.  (*See* Compl. ¶¶ 52–68.)  The complaint alleges, in particular, that Snowden's race was a motivating factor behind his demotion and termination, and that similarly-situated Caucasian officers were not demoted or terminated for engaging in equivalent—or, in some cases, more serious—misconduct.  (*See id.* ¶¶ 56–57.)  Snowden also maintains that USPP knew of his protected EEO activity and terminated him because of it.  (*See id.* ¶¶ 62–65.)

On March 25, 2016, USPP filed a Motion to Dismiss or, Alternatively, for Summary Judgment, which contended (among other things) that Snowden had failed to exhaust his administrative remedies.  (*See* Def.'s Mot. to Dismiss or, Alternatively, for Summ. J., ECF No. 9, at 6.)  Snowden subsequently filed a motion to conduct discovery on a number of issues, including the exhaustion of his claims.  (*See* Pl.'s Mot. to Deny

---

32–34.)  USPP vigorously contests Snowden's version of events.  In its view, Snowden did not contact an EEO counselor until either November 30, 2010, or December 1, 2010—the latter is the date that Snowden identified in his formal complaint as the day he first contacted an EEO counselor.  (*See* Ex. J to Def.'s Mot. at 2; Ex. X to Def.'s Mot., ECF No. 47-26, at 3.)

or Defer Entry of Summ. J. or Dismissal to Permit Pl. to Conduct Disc., ECF No. 15;

Pl.'s Mem. in Supp. of Mot. to Conduct Disc., ECF No. 15-1, at 7.)  On April 25, 2016,

this Court granted in part Snowden's motion and ordered the parties to conduct limited

discovery into the issue of exhaustion.  (*See* Order, ECF No. 21, at 2–3.)  The Court

also denied USPP's motion without prejudice (*id.* at 3), after which the parties

eventually proceeded to conduct a full period of discovery (*see* Scheduling Order, ECF

No. 28; *see also* Def.'s Mot. at 16; Pl.'s Opp'n at 13 n.4).

On October 8, 2019, USPP submitted the Motion to Dismiss or, Alternatively,

for Summary Judgment that is before this Court at present.  (*See* Def.'s Mot., ECF No.

47-2.)  In this motion, USPP argues that (1) Snowden did not "exhaust his

administrative remedies with respect to the imposition of the last chance agreement and

his demotion"; (2) Snowden "cannot meet the causation element for a discrimination or

retaliation claim because his demotion and removal were both effectuated pursuant to

the terms of a valid, voluntarily executed contract"; and (3) Snowden cannot prove that

USPP's asserted reasons for his demotion and termination were pretextual.  (*See id.* at

3–4.)

In his brief in opposition to USPP's motion, Snowden maintains that he

exhausted his administrative remedies by initiating EEO proceedings within 45 days of

his demotion.  (*See* Pl.'s Opp'n at 24–27.)  He also argues that his claims are not barred

by the LCA because that contract did not explicitly waive his right to bring *Title VII*

claims, and that, even if it did, any such waiver is void as against public policy.  (*See*

*id.* at 28–29.)  As for the merits of his discrimination claim, Snowden contends that

USPP's asserted reasons for his demotion and termination are pretextual, primarily

because similarly-situated Caucasian officers were allegedly treated less harshly after committing similar or more serious offenses.  (*See id*. at 34.)  With respect to the retaliation claim, Snowden further argues that USPP's proffered reason for his termination lacks credibility, largely because two officers allegedly told him that USPP management would find a way to retaliate against him for filing his EEO complaint. (*See id.* at 15, 38–43.)

USPP's motion has been fully briefed (*see* Def.'s Reply, ECF No. 49), and is ripe for this Court's consideration.

## II.   MOTIONS FOR SUMMARY JUDGMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 56

When a defendant styles its motion as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), or, in the alternative, a motion for summary judgment under Federal Rule of Civil Procedure 56, the Court may "opt to evaluate one basis for termination of the action and not the other."  *Rochon v. Lynch*, 139 F. Supp. 3d 394, 400 (D.D.C. 2015); *cf. PDK Lab'ys, Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment) (explaining that where there "is a sufficient ground for deciding th[e] case," the "cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more— counsels us to go no further").

In this case, because the parties have completed discovery and also rely on materials outside the pleadings to support their arguments, the Court will treat USPP's motion as a motion for summary judgment.  *See* Fed. R. Civ. P. 12(d); *see also Ross v. U.S. Capitol Police*, 195 F. Supp. 3d 180, 192–94 (D.D.C. 2016) (suggesting that summary judgment is appropriate after the parties have engaged in discovery, especially

in employment discrimination cases); *Crawford v. Johnson*, 166 F. Supp. 3d 1, 7–8
(D.D.C. 2016) (electing to treat defendant's motion as a motion for summary judgment
when the court's resolution of the case depended on materials outside the pleadings),
*aff'd in part and rev'd in part on other grounds*, 867 F.3d 103 (D.C. Cir. 2017);
*Patterson v. United States*, 999 F. Supp. 2d 300, 306 (D.D.C. 2013) (noting that courts
do not consider matters outside the pleadings on a Rule 12(b)(6) motion, unless the
documents are attached, incorporated by reference, or necessarily relied upon in the
plaintiff's complaint).

A court may grant a party's motion for summary judgment when "the movant
shows that there is no genuine dispute as to any material fact and the movant is entitled
to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" under this
standard if it is capable of changing the outcome of the litigation, and a movant is
entitled to summary judgment if the record is such that there is no genuine dispute
concerning the existence of any such material fact, such that no reasonable juror could
return a verdict for the nonmoving party. *See Mount v. Johnson*, 174 F. Supp. 3d 553,
559–60 (D.D.C. 2016).

When reviewing a motion for summary judgment, the court must construe all
facts and reasonable inferences in the nonmovant's favor. *See Reeves v. Sanderson
Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). However, "[t]he mere existence of
*some* alleged [non-material] factual dispute between the parties will not defeat summary
judgment[,]" *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (internal quotation
marks and citation omitted), and "a plaintiff who offers only 'a scintilla of evidence' in

support of its position will not survive summary judgment[,]" *Rochon*, 139 F. Supp. 3d at 401 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

## III.   ANALYSIS

As noted above, USPP has made three arguments in support of its motion for summary judgment with respect to all of Snowden's legal claims; it argues that (1) Snowden failed to exhaust any claims related to his demotion or the imposition of the LCA, (2) the LCA bars Snowden's discrimination and retaliation claims because he agreed to the demotion and assumed the risk of termination, in lieu of being fired for the initial infraction, and (3) USPP had legitimate, non-discriminatory reasons for demoting and then terminating Snowden.  (*See* Def.'s Mot. at 4, 6, 13.)  In their briefs, the parties spill much ink over the question of exhaustion, with each side accusing the other of failing to put forth the necessary evidence to support its position (*see* Pl.'s Opp'n at 24–27; Def.'s Reply at 7, 9–11), but Title VII's exhaustion requirements are not jurisdictional, *see, e.g.*, *Artis v. Bernanke*, 630 F.3d 1031, 1034 n.4 (D.C. Cir. 2011), and thus this Court need not wade into the mire that surrounds the exhaustion dispute when it sees a clearer path to resolving the instant motion, as explained fully below.

In short, this Court finds that the LCA between USPP and Snowden is a valid, enforceable contract, and that Snowden is bound by its terms, including the waiver of his right to challenge any disciplinary action stemming from the agreement.  The Court also concludes that, even if Snowden had not waived his right to challenge his demotion and termination, and even if the Court assumes Snowden exhausted his administrative remedies, USPP would still be entitled to summary judgment, because the record

14

evidence does not support a finding that USPP's asserted reasons for demoting and terminating Snowden are pretextual, or that the challenged actions were actually the result of discrimination and retaliation.

### A. USPP Is Entitled To Summary Judgment Because The LCA Bars Snowden From Challenging His Demotion And Termination

LCAs are "probationary contracts" between an employee facing termination and his employer, wherein the employer agrees to suspend termination proceedings if the employee complies with specific conditions outlined in the agreement.  *See U.S. Dep't of Air Force v. FLRA*, 949 F.2d 475, 478 (D.C. Cir. 1991).  As contracts, LCAs are governed by rudimentary principles of contract law, and it is thus well established that courts will enforce such agreements if (1) the LCA contains the necessary elements of a valid contract—namely, "a mutual intent to contract including offer, acceptance, and consideration[,]" *Ascom Hasler Mailing Sys., Inc. v. U.S. Postal Serv.*, 885 F. Supp. 2d 156, 182 (D.D.C. 2012) (internal quotation marks and citation omitted)—and (2) the parties entered into the agreement knowingly and voluntarily, *see Johnson v. Veneman*, 569 F. Supp. 2d 148, 155 (D.D.C. 2008).[6]  In evaluating whether these criteria have been met, courts look for "an exchange of promises—through commitments to act or refrain from acting in a specified way—that are evidenced in a writing or are inferable from conduct."  *See Ascom*, 885 F. Supp. 2d at 182 (internal quotation marks and citation omitted).  Moreover, and notably, such mutual assent can exist "when two

---

[6] Additionally, where one party to such a contract is a federal agency, courts must also ensure that the government representative "who entered or ratified the agreement" had authority "to bind [the agency] in contract."  *See Ascom*, 885 F. Supp. 2d at 182 (internal quotation marks and citation omitted).  That requirement is easily satisfied here, as the Acting Assistant Chief of Police ratified the LCA at issue in this case, and the Acting Assistant Chief has authority to bind the USPP.  (*See* LCA at 5; Ex. O to Def.'s Mot. at 15–17; Ex. T to Def.'s Mot., ECF No. 47-22, at 3.)

parties sign a contract regardless of the parties' subjective intent[,]" and "[p]rovided there is no fraud, duress, undue influence, or mistake, a party is typically bound to any agreement for which there is assent." *Serv. Emps. Int'l Union Local 32BJ v. Diversified Servs. Grp., Inc.*, 958 F. Supp. 2d 166, 172–73 (D.D.C. 2013).

### 1. The LCA Between USPP And Snowden Was A Valid Contract

The parties do not dispute that the LCA contains the necessary elements of contract formation—and for good reason.  (*See* Pl.'s Opp'n at 29; Def.'s Reply at 13.)  USPP specifically spelled out the terms of the agreement in the LCA, and Snowden accepted those terms by signing the contract.  (*See* LCA at 2, 5.)  There was also an exchange of promises and forbearances on both sides.  USPP expressly promised to hold Snowden's removal in abeyance if Snowden agreed to a demotion, acknowledged that he would be terminated if he engaged in future misconduct, and waived his right to appeal any disciplinary action arising out of the agreement.  (*See id.* ¶¶ 2–3, 15.)  Meanwhile, Snowden promised to not "engage in any sustained misconduct of any kind during the duration of" the LCA, and he did so in exchange for his continued employment with USPP.  (*See id.* ¶ 3; *see also id.* at 1.)  These facts, taken together, indisputably demonstrate offer, acceptance, and consideration, and the parties' signatures provide objective evidence of "a mutual intent to contract."  *See Ascom*, 885 F. Supp. 2d at 182 (internal quotation marks and citation omitted).

With the rudimentary elements of contract formation in place, the next question is whether Snowden entered into the LCA knowingly and voluntarily.  *See Veneman*, 569 F. Supp. 2d at 155.  Based on the evidence in the record, this Court has no doubt that he did.  Snowden took more than sixty days to decide whether or not to sign the agreement, and he was represented by a lawyer at the time he executed the contract.

What is more, he attempted to negotiate various terms of the contract with the Acting Assistant Chief of Police.  (*See* Pl.'s Resp. to SUMF ¶¶ 17, 19–21.)  Under these circumstances, there is simply no factual basis upon which to conclude that Snowden signed the LCA against his will or did not understand the terms to which he agreed.[7]

Accordingly, the Court finds that the LCA, as a general matter, is a valid and enforceable contract.  *See Johnson v. Penn. Camera Exchange*, 583 F. Supp. 2d 81, 86 (D.D.C. 2008) ("Absent a showing of fraud or duress, parties are bound by the agreements that they sign, without regard to whether they regret their decisions after the fact." (citation omitted)).

2.  <u>Pursuant To The LCA, Snowden Agreed To Waive His Right To Appeal His Demotion And Termination In Any Forum, And This Court Must Honor The Terms Of The Parties' Valid, Enforceable Agreement</u>

 A contract's waiver of a party's appeal rights is enforceable if the waiver's terms are unambiguous, *see Anzueto Wash. Metro. Area Transit Auth.*, 357 F. Supp. 2d 27, 30–31 (D.D.C. 2004), and if the party that relinquished its appeal rights did so knowingly and voluntarily, *see Veneman*, 569 F. Supp. 2d at 155.  The Court finds that both requirements are met here.

To start, the contract's waiver provision (*see* LCA ¶¶ 3, 15) is as unambiguous as it gets.  Under paragraph 15 of the LCA, Snowden agreed that if he "breache[d] th[e] Agreement and the removal action [wa]s effected, he waive[d] *any and all rights* to challenge, grieve, litigate, complain or appeal *any disciplinary action*."  (*Id.* ¶ 15 (emphasis added).)  In this Court's view, the provision's plain text unequivocally

---

[7] To the extent that Snowden implies that he was "forced" to sign the LCA "immediately" (*see* Pl.'s Opp'n at 9; Snowden Decl. ¶ 19), the fact that he was represented by a lawyer and had over sixty days to contemplate the agreement—which he acknowledges (*see* Pl.'s Resp. to SUMF ¶¶ 17, 21)—belies any suggestion of coercion.

covers Snowden's instant claims regarding his demotion and termination, which, by their nature, are "challenge[s]" to subsequent "disciplinary action[s]."  (*See id.*)  And the fact that Snowden agreed to this waiver knowingly and voluntarily can hardly be disputed, since he had ample time to consult with an attorney about the LCA and to review the contract's provisions, and actually did so.

Snowden's struggle to sidestep the conclusion that the LCA's clear waiver provision must be enforced includes the argument that the LCA did not explicitly waive his right *to bring claims under Title VII* (*see* Pl.'s Opp'n at 28–29), and that, regardless, any waiver of his Title VII rights is unenforceable as a matter of public policy (*see id.*).  Neither argument is persuasive.  First, as noted above, the plain text of the LCA is unambiguous: in the event of any sustained misconduct during the effective period of the agreement, Snowden plainly waived "any and all rights to challenge, grieve, litigate, complain or appeal any disciplinary action."  (LCA ¶ 15.)  Given the breadth of this waiver, the fact that the LCA does not reference Title VII claims *in particular* is of no moment, and, indeed, Snowden does not provide any support for the proposition that the agreement's lack of specificity in this regard matters.  This failure is most likely attributable to the fact that the case law in this jurisdiction cuts in the opposite direction.  *See, e.g.*, *Anzueto*, 357 F. Supp. 2d at 31 (finding that a contract precluded the plaintiff from asserting a Title VII claim against his employer when the contract barred "any and all . . . claims, demands, damages, actions, and causes of action of every kind" arising out of the employment relationship).

Snowden's alternative argument—that any waiver of his Title VII rights is unenforceable as a matter of public policy—fares no better, as courts in this circuit and

elsewhere have routinely upheld waivers of a plaintiff's right to bring Title VII claims. *See, e.g.*, *Veneman*, 569 F. Supp. 2d at 154–55; *Anzueto*, 357 F. Supp. 2d at 30–32; *Maceda v. Billington*, No. 01-cv-461, 2003 WL 25782447, at *2 (D.D.C. Jan. 17, 2003); *see also Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52 & n.15 (1974) (stating that "presumably an employee may waive his cause of action under Title VII as part of a voluntary settlement," so long as the employee's "consent to the [agreement] was voluntary and knowing"); *Hay Adams Hotel LLC v. Hotel & Rest. Emps., Local 25*, No. 06-cv-968, 2007 WL 1378490, at *3 (D.D.C. May 9, 2007) (noting that "though the terms of [an] LCA might be very harsh or unreasonable, the parties agreed to it and the contract is exactly what it purports to be—a 'last chance' agreement" (internal quotation marks and citation omitted)).  And given this Court's finding that the LCA is a valid, enforceable contract, and also that Snowden agreed to the LCA's waiver provision knowingly and voluntarily, the Court sees no reason to depart from this lengthy line of precedent here.[8]

### B. Even If Snowden Had Not Waived His Right to Challenge His Demotion And Termination, His Discrimination Claims Under Title VII Would Still Fail, Because No Reasonable Juror Could Find That USPP's Legitimate, Non-Discriminatory Reasons For The Challenged Actions Are Pretextual

After reviewing the evidence and arguments in this case, the Court has also concluded that, even if Snowden had not waived his right to challenge his demotion and

---

[8] Snowden cites a single case from a district court in this circuit in support of his contention that an LCA's waiver of a plaintiff's right to file an EEO complaint alleging discrimination under the Rehabilitation Act is void as against public policy.  (*See* Pl.'s Opp'n at 29 (citing *Callicotte v. Carlucci*, 698 F. Supp. 944, 946 (D.D.C. 1988).)  This Court finds Snowden's reliance on *Callicotte* unwarranted for several reasons, not the least of which is the fact that what is at issue in the instant case is whether an LCA can bar a plaintiff from asserting waived Title VII claims in federal court, not whether a plaintiff may waive his right to file an EEO complaint.  In addition, the court in *Callicotte* was concerned that the plaintiff had unknowingly and involuntarily waived her rights.  *See Callicotte*, 698 F. Supp. at 947 n.2.  That concern is not present here for the reasons explained above.

termination, USPP would still be entitled to summary judgment on Snowden's claims that USPP discriminated against him based on his race.

Title VII prohibits employers from "discharg[ing] any individual, or otherwise discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To state a claim for race discrimination under Title VII, a plaintiff must show that he suffered an adverse employment action because of his race. *See Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008). And when presented with a Title VII discrimination claim, courts apply what is known as the *McDonnell Douglas* burden-shifting analysis, with the burden of production first resting with the plaintiff, who must present a prima facie case of discrimination by a preponderance of the evidence, and then—if the plaintiff can make such a case—the burden shifts to the defendant to provide a non-discriminatory reason for the challenged adverse employment action. *See Johnson v. Perez*, 66 F. Supp. 3d 30, 37 (D.D.C. 2014) (first citing *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–53 (1981); and then citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973)). If the defendant is able to do so, the burden shifts back to the plaintiff to establish that the defendant's proffered reasons are pretextual. *Id.*

Importantly, where, as here, an employer has asserted a legitimate non-discriminatory reason for the challenged action, courts in this jurisdiction proceed as if the shifting framework "falls away[,]" *see Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016), and ultimately focus solely on whether the plaintiff has offered "sufficient

evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race," *Brady*, 520 F.3d at 494.  To make that assessment, the court is required to consider "all of the evidence, taken together . . . includ[ing] testimony from the decision-maker involved and other employees, comparative evidence suggesting that the employer treated other employees of a different race more favorably in the same factual circumstances, or any other evidence suggesting the employer is making up or lying about the underlying facts that formed the predicate for the employment decision."  *Sledge v. District of Columbia*, 63 F. Supp. 3d 1, 16 (D.D.C. 2014) (internal quotation marks and citation omitted).

> 1. Snowden Has Failed To Offer Sufficient Evidence To Support A Finding That USPP's Asserted Explanation For His Demotion Is A Pretext For Race Discrimination

Here, USPP has articulated a legitimate, non-discriminatory reason for its decision to demote Snowden: that Snowden misused law enforcement software to provide information to a third party, and failed to report the alleged misuse of law enforcement databases by other officers.  (*See* Def.'s Mot. at 14; Def.'s Reply at 15–16, 19.)  The record provides ample support for USPP's asserted explanation for the demotion.

As an initial matter, it is undisputed that Snowden committed those infractions. The DEA recorded the phone conversation in which Snowden provided database information to Lamont, and during his oral response to the Notice of Removal, Snowden admitted to accessing the law enforcement databases for Lamont and observing other officers misuse the databases.  (*See* Pl.'s Resp. to SUMF ¶¶ 8, 11.) Snowden also informed Lamont on the call that he could lose his job if he provided the

requested information, but he proceeded to give Lamont the data anyway.  (*See id.* ¶ 8.)
Plus, in the Decision on Proposed Removal, the Acting Assistant Chief of Police
described the seriousness of Snowden's misconduct and explained why Snowden's
behavior warranted his removal.  For example, the Acting Assistant Chief stated that
USPP could have lost its license for the databases, and that Snowden's failure to report
others' misconduct called into question Snowden's ability to perform his role as a
supervisor.  (*See* Decision on Proposed Removal at 2–4; LCA at 2.)  It is also worth
noting that Snowden not only acknowledged the seriousness of his misconduct by
signing the LCA, but also explicitly agreed to his demotion as an alternative to the
termination of his employment.  (*See* LCA ¶¶ 1–2.)  Having accepted the terms of the
LCA, and having consented to the very disciplinary action that he now challenges,
Snowden cannot reasonably maintain that USPP lacked a legitimate, non-discriminatory
reason for demoting him.

Undaunted, Snowden maintains that his misuse of law enforcement databases
could not have been the *real* reason for his demotion, given USPP's delay in
implementing the LCA and the fact that USPP has given inconsistent explanations for
imposing the LCA in the Decision on Proposed Removal and its instant motion.  (*See*
Pl.'s Opp'n at 33–34.)  Snowden also asserts that similarly-situated Caucasian officers
who engaged in similar or more serious misconduct were not demoted.  (*Id*. at 34–35,
37–38.)  But the record provides little support for these contentions.

For starters, it is undisputed that the officials responsible for implementing the
LCA offered a non-discriminatory reason for the delay (clerical error), and Snowden
has not offered any reason for a factfinder to believe that the delay actually resulted

from racial discrimination.  (*See* Pl.'s Resp. to SUMF ¶ 33.)  In addition, the Court cannot find any material inconsistencies between the reasons given for imposing the LCA that USPP asserted in the Decision on Proposed Removal and USPP's arguments in the instant motion.  In both documents, USPP unambiguously explains that Snowden's sustained charges—misuse of law enforcement databases and neglect of duty—warranted his immediate termination, and that USPP presented Snowden with the LCA as an alternative to removal in order to give Snowden an opportunity to keep his job.  (*See* Decision on Proposed Removal at 2–3; Def.'s Statement of Facts, ECF No. 47-1, ¶¶ 13–16.)  And nothing about the subsequent delay in Snowden's demotion or USPP's asserted reason for imposing the LCA in lieu of termination suggests that USPP's explanation for Snowden's demotion was pretextual.

Snowden's comparator evidence does not support his claim either.  To raise a reasonable inference of race discrimination based on comparator evidence, Snowden must demonstrate that USPP "treated other employees of a different race more favorably in the same factual circumstances[.]"  *Sledge*, 63 F. Supp. 3d at 16.  In his brief, Snowden identifies sixteen Caucasian USPP officers who "were not removed or demoted for first offenses involving charges of comparable seriousness to those charges that were sustained against [him]."  (Pl.'s Opp'n at 35; *see also id.* at 35–37 (providing the example of a Caucasian officer who allegedly viewed pornography on his work computer and was removed only after his third offense, and another officer who was merely suspended for misusing law enforcement databases for personal reasons).)  Even if one accepts that Snowden's account of these comparators' circumstances is true,

however, no reasonable jury could conclude that USPP's treatment of these other officers is evidence of racially discriminatory treatment in Snowden's case.

Out of the sixteen comparators to which Snowden points, only one appears to have signed an LCA.  (*Compare* Pl.'s Opp'n at 20 (noting that Officer Mace signed an LCA) *with id.* at 38 (stating that "Plaintiff alone was given the option of immediate removal or signing an LCA").)  And, even then, the one comparator who apparently signed an LCA had an infraction that was substantially different than Snowden's.  That official was charged with misusing a government credit card (*see id.* at 20), and he was merely an officer at the time he signed the LCA (*see id.*), not a sergeant "held to a higher standard of responsibility and conduct than a non-law enforcement supervisor" (Decision on Proposed Removal at 3).  Moreover, each LCA is apparently individually negotiated (or has the potential to be negotiated), so the fact that this officer was not demoted—and instead agreed to serve a 30-day suspension and pay back the money he spent in the context of his own LCA—hardly demonstrates that USPP treats similarly-situated employees of a different race more favorably.  *See Brady*, 520 F.3d at 495.

Snowden attempts to salvage his claim by suggesting that the existence of the LCA itself is evidence of discrimination, as USPP "disparately issued . . . [and] imposed" LCAs on some employees and not others.  (*See* Pl.'s Opp'n at 32.)  Indeed, throughout his brief, Snowden suggests that the imposition of the LCA was unfair and discriminatory, and that he should not have been "forced" to sign it.  (*Id.* at 9.)[9]  These

---

[9] For example, in his opposition brief, Snowden claims that "[a]t the time that he signed the LCA in October 2008, [he] reasonably believed that the LCA violated his Title VII rights since he was subjected to disciplinary actions that were applied disparately to him compared to similarly-situated Caucasian officers."  (Pl.'s Opp'n at 29.)  He also contends that the Acting Assistant Chief of Police wrote a memorandum concluding that Snowden's misuse of law enforcement databases did not warrant his termination, and that a human resources representative told Snowden that she thought USPP's imposition of the LCA was unfair.  (*See id.* at 9.)  Snowden additionally suggests that USPP should not

arguments are misplaced, because Snowden has not alleged in his complaint that the LCA was unlawful (*see* Compl. ¶¶ 52–68), and his window for doing so has long expired, given that the statute of limitations for challenging contracts like the LCA ran out in 2014, at the latest, which was a whole year before Snowden filed this lawsuit, *see Holmes v. United States*, 657 F.3d 1303, 1313–17 (Fed. Cir. 2011) (explaining that if a contract falls within the purview of the Tucker Act, which allows plaintiffs to raise federal challenges regarding contracts with the United States government under certain circumstances, a six-year statute of limitations applies); *see also* D.C. Code § 12-301(7) (providing for a three-year statute of limitations for contract-based claims brought under state law).  Even more to the point, if Snowden believed that the LCA and his demotion were unfair and discriminatory at the time USPP presented him with the contract in 2008, he could have—and *should* have—refused to sign the agreement, and he could have then proceeded to challenge not only the alleged requirement that he sign an LCA but also any adverse employment actions that occurred as a result of his refusal to do so.

Unfortunately for Snowden, however, he did no such thing.  Instead, after consultation with an attorney, Snowden accepted the terms of the contract, including the demotion, by signing the LCA.  And having unequivocally consented to the very employment action that he now seeks to challenge, Snowden is effectively precluded from maintaining that the bargained-for demotion was a pretext for race discrimination, as USPP correctly observes.  (*See* Def.'s Mot. at 14; *see also id.* at 12.)

---

be able to enforce the LCA against him under the "unclean hands" doctrine, given USPP's delay in implementing his demotion and the fact that the agency's EEO representative never explicitly informed Snowden that he would be waiving his rights to appeal his demotion and termination if he signed the LCA.  (*See id.* at 31.)

2. <u>Snowden Has Failed To Offer Sufficient Evidence To Support A Finding That USPP's Asserted Explanation for His Termination Is A Pretext for Race Discrimination</u>

As was the case with Snowden's demotion, USPP has also articulated a legitimate, non-discriminatory reason for its decision to terminate Snowden's employment.  Per the terms of the LCA, Snowden's participation in any "sustained misconduct" during the duration of the LCA would constitute a breach of contract, in which case USPP would "reinstate the removal action without further notice."  (LCA ¶ 3.)  USPP contends—and the evidence reflects—that Snowden triggered this provision on July 4, 2010, when he used the CCTV camera to zoom in on women's breasts and buttocks while he was supposed to be conducting general video surveillance.  (*See* Ex. H to Def.'s Mot. at 2–4; Ex. L to Def.'s Mot. at 2.)  After the Internal Affairs Unit conducted a full investigation of the incident, the Office of Professional Responsibility sustained the proposed charges (*see* Ex. H to Def.'s Mot. at 2–4; Ex. L to Def.'s Mot. at 2), prompting USPP to amend its removal decision and terminate Snowden for his breach of the agreement (*see* Ex. M to Def.'s Mot. at 2).  Under these circumstances, it is clear to the Court that USPP has asserted a legitimate, non-discriminatory reason for Snowden's termination, and has provided evidence to support its contention that Snowden's misconduct triggered the LCA provision that gave rise to his termination.

In attempting to rebut USPP's asserted explanation for his firing, Snowden relies on the same arguments that he advanced above; namely, that the imposition of the LCA was itself a discriminatory act, and that similarly-situated Caucasian officers did not face the same penalties for similar or more serious misconduct.  (*See* Pl.'s Opp'n at 32, 37–38.)  But, as the Court has already explained, Snowden provides no evidence of discrimination in connection with the LCA's execution, nor does his complaint assert

any claim challenging the imposition of the LCA itself.  And none of his alleged comparators are similarly-situated.  Therefore, the Court concludes that no reasonable juror could find that USPP's articulated reason for Snowden's termination is a pretext for discrimination, and as a result, USPP is entitled to summary judgment on both of Snowden's discrimination claims under Title VII.

### C. Snowden's Retaliation Claim Also Fails, Because No Reasonable Juror Could Conclude That USPP's Legitimate, Non-Retaliatory Reason For Terminating Snowden Was Pretextual

Snowden has also brought a retaliation claim under Title VII, alleging that USPP terminated him as reprisal for the contact that he initiated with an EEO representative. (*See* Compl. ¶¶ 62–67.)  The Court finds that USPP is entitled to summary judgment on this claim as well.

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that "(1) he engaged in protected activity; (2) he was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action."  *Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012) (internal quotation marks and citation omitted).  Just as with discrimination claims under Title VII, courts in this jurisdiction evaluate retaliation claims using the *McDonnell Douglas* burden-shifting framework.  *See Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).  And courts in this circuit likewise zero in on the "ultimate question whether all of the evidence, taken together, supports an inference of retaliation when the employer has proffered a legitimate, non-discriminatory reason for the adverse action at issue."  *Sledge*, 63 F. Supp. 3d at 19 (citation omitted).

In evaluating whether the record supports an inference of retaliation, courts may consider both direct and circumstantial evidence, including evidence that "the employer treated other, similarly situated employees better; that the employer is lying about the underlying facts of its decision; that there were changes and inconsistencies in the employer's given reasons for the decision; that the employer failed to follow established procedures or criteria; or that the employer's general treatment of . . . employees who asserted their Title VII rights[] was worse than its treatment of . . . employees who did not assert their Title VII rights[.]"  *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015) (internal quotation marks and citation omitted).  But, here, Snowden has failed to offer evidence of *any* kind from which a reasonable jury could find that USPP's purported reason for terminating him—*i.e.*, that Snowden breached the LCA by engaging in sustained misconduct, which triggered the contract's automatic removal provision—is a pretext for retaliation.

For one thing, to the extent that Snowden relies on the same comparators that he marshalled for his discrimination claim (*see* Pl.'s Opp'n at 16, 43 (suggesting that USPP officers who committed similar misconduct but did not engage in protected activity were not terminated for their actions)), it appears that not one of Snowden's identified comparators had also breached the unambiguous terms of an LCA (*see id.* at 16–22).  Without that critical similarity, Snowden's comparator evidence falls far short of demonstrating pretext.

Next, Snowden asserts that multiple USPP officers told him that "since he filed an EEO complaint, management would find a way to remove him[,]" and that "USPP management was trying to persuade them to file an [internal affairs] complaint against

28

[Snowden] regarding his July 4th activities but that they declined to do so." (*Id.* at 40.) Snowden argues that these statements serve as sufficient evidence of USPP's retaliatory "animus" and demonstrate that USPP used the July 4th incident as pretext for "hav[ing] [Snowden] removed for filing an EEO complaint" (*see id.* at 43), but he has failed to provide *admissible* evidence that these statements were made, and it is well established that "sheer hearsay . . . counts for nothing on summary judgment," *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (internal quotation marks and citation omitted).

Snowden also points to the alleged inconsistency between "USPP leadership's initial reactions" to the July 4th incident and their later complaints. (Pl.'s Opp'n at 43.) In this regard, he maintains that "[p]rior to contacting EEO representatives, [he] had heard nothing adverse regarding his operation of the CCTV camera on July 4th, 2010" and that "the only conversations that he had with peers and USPP leadership reflected that the images of the women in bikinis were considered to be a joke and that it was of minimal effect." (*Id.* at 39–40.) Snowden additionally asserts that Captain Guddemi told him that he did not believe Snowden's activities warranted a formal complaint—but then went ahead and filed a complaint against Snowden after Snowden initiated contact with the EEO representative. (*See id.* at 15.) As has already been mentioned, USPP disputes that Snowden's contact with the EEO office preceded the complaints that led to his termination. But even if Snowden's timeline is accurate, his assertions do not support a reasonable inference that he was terminated *because of* his EEO activity, and this is especially so given that whatever reasons USPP's leadership may have had for allegedly changing their minds about the severity of Snowden's conduct, it was the Internal Affairs Unit and the Office of Professional Responsibility that

29

ultimately investigated the incident and sustained charges against him, not the officers that apparently considered Snowden's conduct to be "a joke." And, indeed, Snowden has not alleged that the Internal Affairs Unit or the Office of Professional Responsibility even *knew* of his protected EEO activity, let alone that they were influenced by it.[10]

In a further attempt to show that USPP's proffered reason for his termination is a pretext for retaliation, Snowden maintains that his conduct on July 4th, 2010, was not sufficiently serious to warrant any adverse employment action, and, for that matter, did not even rise to the level of misconduct. This argument is meritless, for two primary reasons. First, the record evidence establishes that Snowden engaged in serious misconduct. For example, the investigative report that the Internal Affairs Unit prepared found that

> [t]he camera appeared to be primarily focused on a female wearing a green bikini. The camera was manually zoomed closer in and appeared to be focusing on an area below the woman's shoulders to include her breasts and groin area. The camera was held at this position for several moments. The camera was panned left and right and stopped on several women capturing video that primarily included the buttocks. The camera was manually panned back to the woman in the green bikini and manually zoomed in closer to include her lower back and buttocks.

---

[10] To be sure, under a "cat's paw" theory of liability, employers may be held responsible when "a formal decision maker [is] an unwitting conduit of another actor's [discriminatory or retaliatory] motives." *See Walker v. Johnson*, 798 F.3d 1085, 1095 (D.C. Cir. 2015). But, here, the state of the record is such that no reasonable jury could find that Captain Guddemi retaliated against Snowden by filing an administrative complaint. Snowden's reliance on inadmissible hearsay is insufficient to support an inference of pretext, and, without more, the mere fact that Captain Guddemi may have altered his views about Snowden's misconduct in the wake of the incident does not suggest that his complaint was motivated by retaliatory animus. (*See also* Decl. of Charles J. Guddemi, Ex. W to Def.'s Mot., ECF No. 47-25, ¶ 4 (stating that he was unaware Snowden had submitted an EEO complaint at the time he filed his allegations against Snowden).)

(Ex. H to Def.'s Mot. at 3.)  That account comports with the photographs in the record that document the CCTV camera's footage.  (*See* Ex. U to Def.'s Mot., ECF No. 47-23, at 3–4.)  And Snowden's present assertions that the camera was zoomed in on these women for "about one-half of one percent (.004) of the time that he worked on July 4, 2010" (Pl.'s Opp'n at 12), and that the "zoom feature may have frozen or he could have accidentally zoomed while he was distracted with a telephone call" (*id.* (suggesting that his focus on the bikini-clad women was unintentional)), are in conflict with the testimony he gave to the Internal Affairs Unit following the incident.  (*See* Ex. EE to Def.'s Reply at 8 (stating that, as the operator of the CCTV camera, he had control over the zoom and moving functions of the camera); *see id.* at 21 (defending his zooming in on the women as part of his job duties).)  The second reason that Snowden's efforts to minimize his inappropriate conduct fails is that the LCA plainly provided for Snowden's removal if he engaged in "any" sustained misconduct—not misconduct of a specified level of severity.  (*See* LCA ¶ 3.)  Thus, Snowden's subjective interpretation of the seriousness of his repeated misuse of the camera is irrelevant.

Finally, Snowden points to the temporal proximity between his contact with the EEO counselor on August 16, 2010, and Captain Guddemi's filing of an administrative complaint about his inappropriate use of the CCTV camera on August 25, 2010.  Again, USPP insists that Snowden did not actually contact the EEO counselor until at least November 30, 2010—long after Captain Guddemi filed his administrative complaint. (*See* Pl.'s Resp. to SUMF ¶ 63; Def.'s Reply at 8.)  But this is not an issue of material fact, because even assuming that Snowden did contact the EEO representative shortly before Captain Guddemi filed the administrative complaint, the temporal proximity

between these two events, standing alone, is insufficient to raise a reasonable inference of pretext.  It is the binding precedent of this circuit that "positive evidence beyond mere proximity is required to defeat the presumption that the [employer's] proffered explanations are genuine[.]"  *Talavera v. Shah*, 638 F.3d 303, 313 (D.C. Cir. 2011) (internal quotation marks and citation omitted); *see also, e.g.*, *Woodruff v. Peters*, 482 F.3d 521, 530–31 (D.C. Cir. 2007).  And for the reasons just discussed, Snowden has not offered any other admissible evidence that creates a genuine issue of material fact regarding USPP's motivation for his termination.

## IV.  CONCLUSION

The Court finds that Snowden waived his rights to pursue a legal claim concerning his demotion or termination based on the plain text of the parties' valid, enforceable agreement, and even if Snowden was able to pursue this action consistent with the parties' contract, no reasonable jury could find that USPP's asserted explanation for demoting or terminating Snowden is a pretext for race discrimination or retaliation due to his protected EEO activity, given the plain terms of the LCA and Snowden's apparent subsequent misuse of the CCTV camera.  Therefore, USPP is entitled to summary judgment with respect to all of the claims in the complaint, and this Court effectively ordered as much when, on November 30, 2020, it **GRANTED** USPP's Motion to Dismiss or, Alternatively, for Summary Judgment.[11]

DATE:  December 9, 2020

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge

---

[11] The Court is issuing an Amended Order contemporaneously with this Opinion to clarify that it has treated USPP's Motion to Dismiss or, Alternatively, for Summary Judgment as a motion for summary judgment under Rule 56, and to direct that judgment shall be issued in USPP's favor on all counts of the complaint.